J-S03003-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2601 EDA 2022 |

Appeal from the Order Entered September 19, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000208-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2602 EDA 2022 |

Appeal from the Decree Entered September 19, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000215-2022

BEFORE:  BOWES, J., McCAFFERY, J., and SULLIVAN, J.

MEMORANDUM BY BOWES, J.:                    **FILED MARCH 21, 2023**

T.B. ("Father") appeals from the September 19, 2022 decree granting the petition filed by the Philadelphia Department of Human Services ("DHS") to involuntarily terminate his parental rights to his son, K.B., born in

January 2020.[1]  Father also appeals from the September 19, 2022 order changing K.B.'s permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351.  We affirm the termination decree and the goal change order.

We summarize the factual and procedural history as follows.  DHS received a referral in January 2020, as a result of Mother giving birth to K.B. while incarcerated.[2]  N.T., 9/19/22, at 6-7.  Mother had a prior history with DHS, as well as a history of drug usage and mental illness.  *Id*. at 7.  As a result of positive testing for illegal substances, K.B. was hospitalized for five weeks for treatment of withdrawal symptoms.  *Id*. at 7-8.

On February 10, 2020, as K.B. was ready for discharge from the hospital, DHS obtained an Order of Protective Custody ("OPC") and placed him with his maternal aunt ("Maternal Aunt"), a pre-adoptive resource.  *Id*. at 8. Following a shelter care hearing, the court ordered twice weekly supervised visitation at the agency and an assessment of Father's home.  On May 5, 2020, the trial court adjudicated K.B. dependent and maintained his placement with Maternal Aunt, where he has remained.  The court established a placement

---

[1]  In separate decrees, the trial court also terminated the parental rights of K.B.'s mother, K.B. ("Mother"), and any unknown father.  Neither Mother nor any unknown father appealed those decrees or participated in the instant appeal.

[2]  Mother did not identify Father or list him on the birth certificate.  N.T., 9/19/22, at 8, 25.  Nevertheless, Father contacted DHS and participated in all hearings.  *Id*. at 25, 28.

goal of return to parent or guardian and continued twice weekly supervised visitation.

Throughout K.B.'s dependency, Father was required to satisfy the following permanency objectives aimed at reunification: 1) comply with services, supervised visitation, and all court orders; 2) provide proof of income and adequate housing; and 3) complete a Behavioral Health Services ("BHS") evaluation, a Clinical Evaluation Unit ("CEU") assessment, three random drug screens, and a parenting program at Achieving Reunification Center ("ARC"). *Id*. at 28. The court further directed Father to, *inter alia*, sign releases and provide medical documentation. *Id*. at DHS Exhibit 3, Permanency Review Order, 12/6/21.[3]

The juvenile court characterized Father's compliance with the permanency plan as vacillating between minimal and moderate. Notably, Father neglected to participate in a second behavioral health evaluation, as ordered in December 2021, until April 2022. *Id*. at 32, 60. He failed to provide proof of income, and, despite signing releases, he failed to provide medical documentation. *Id*. at 28-29, 38, 51-52, 54, 61, 63. Further, Father's visitation, which remained supervised and was reduced by the court to weekly in December 2021, was inconsistent, with a ten-month interruption between October 18, 2021, and August 10, 2022. *Id*. at 38, 41, 55, 97.

---

[3] While there appears to be a missing page or two from DHS Exhibit 3, we observe that the dependency record is part of the certified record.

On March 31, 2022, DHS filed a petition for the termination of parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), as well as a petition for a change of K.B.'s permanency goal from reunification to adoption. The trial court held a hearing on the petitions on September 19, 2022. Mother and Father were each present and represented by counsel. K.B., then thirty-two months old, was represented by Emily Cherniack, Esquire.[4] DHS presented the testimony of Anajah Custus, the case manager with community umbrella agency ("CUA").[5] Attorney Cherniack presented the testimony of Patricia Kinkle, the Court Appointed Special Advocate ("CASA") program director.[6] Mother and Father each testified on their own behalf.

At the time of the hearing, Mother and Father were residing together with a younger child, who is not part of the instant proceedings. Mother was serving as Father's home health care aide. *Id*. at 9-11, 30. As it relates to

---

[4] Attorney Cherniack was identified as both the guardian *ad litem* ("GAL") and the child advocate. Our Supreme Court has instructed this Court to verify *sua sponte* that the court appointed counsel to represent a child pursuant to 23 Pa.C.S. § 2313(a), and if counsel served in a dual role, that the court determined before appointment that there was no conflict between a child's best and legal interests. *See In re Adoption of K.M.G.*, 240 A.3d 1218 (Pa. 2020). If a child is "too young to be able to express a preference as to the outcome of the proceedings," there is no conflict between a child's legal and best interests, and a child's subsection 2313(a) right to counsel is satisfied by an attorney- GAL who represents the attorney-GAL's view of the child's best interests. *See In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018). In this case, because K.B. was 32 months old at the time of the subject proceeding, we conclude that his statutory right to counsel was satisfied.

[5] The notes of testimony incorrectly identify Ms. Custus' first name as Amajah.

[6] The notes of testimony misname Ms. Kinkle as Ms. Kinchloe.

one aspect of Father's argument, Father testified that he has disintegrating disc disease and numerous herniated discs, as well as diabetes, high blood pressure, and weight issues. *Id*. at 101, 107. He explained, "Sometime I might need help cooking, sometime I might need help putting my clothes on. It depends on how I feel at the particular time, you know." *Id*. at 115.

On September 19, 2022, the trial court involuntarily terminated Father's parental rights to K.B. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b) and by separate order the court changed K.B.'s permanency goal from reunification to adoption. Father timely filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court consolidated the appeals *sua sponte*.

Father presents the following issues, which we reorder for ease of disposition:

> A. Whether the trial court committed reversible error when it involuntarily terminated [Father]'s parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act[,] 23 [Pa.C.S. § 2511 (a)(1), (2), (5), and (8)?]
>
> B. Whether the trial court committed reversible error when it involuntarily terminated [Father]'s parental rights without giving primary consideration to the effect that the termination would have on the developmental physical and emotional needs of the child as required by the Adoption Act[,] 23 [Pa.C.S. § 2511(b)?]
>
> C. Whether the trial court erred and abused its discretion when it changed the goal to adoption because the goal of adoption was not in the best interest of the child[?]

Father's brief, unnumbered at 4 (unnecessary capitalization omitted).

We review orders that involuntarily terminate parental rights for an abuse of discretion, which our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*.

Termination of parental rights is governed by § 2511 of the Adoption Act. If the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, then the court must assess the petition under § 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of § 2511(a), as well as § 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004).

- 6 -

We analyze the court's termination decree pursuant to § 2511(a)(2) and (b),[7] which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

---

[7] While we conduct our analysis under § 2511(a)(2), we note that § 2511(a)(5) and § 2511(a)(8) are not applicable to Father because K.B. was not removed from Father's care.  **See In re C.S.**, 761 A.2d 1197, 1200 n.5 (Pa.Super. 2000) (*en banc*) (stating that § 2511(a)(5) and (8) did not provide a basis for terminating the father's parental rights when he was incarcerated at the time of the child's removal from the mother's care).

With regard to the termination of parental rights pursuant to § 2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa.Super. 2021) (quoting *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015)) (internal citation omitted). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Matter of Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa.Super. 2017) (quoting *In re N.A.M.*, 33 A.3d 95, 100 (Pa.Super. 2011)). As such, "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re S.C.*, *supra* at 1105 (*In re Z.P.*, 994 A.2d 1108, 1118 (Pa.Super. 2010).

As it specifically relates to a physical or mental impairment, it is well-settled that § 2511(a)(2) provides the statutory basis for "terminating

involuntarily the rights of a parent with a physical or mental impairment." ***In re Adoption of J.J.***, 515 A.2d 883, 893 (Pa. 1986). Our Supreme Court emphasized, "the focus in such cases is the effect which an impairment has on the person's ability to provide parental care, not the mere fact of impairment. . . ." ***Id***. As such, the Court stated, "The fact that a parent suffers from a physical or mental disability is not, and never was, the only relevant factor in determining whether his or her parental rights should be terminated, or whether there should be a different legal standard applied." ***Id***.

In concluding that DHS satisfied the statutory grounds to terminate Father's parental rights pursuant to § 2511(a)(2), the trial court emphasized Father's lack of ability to carry out his own activities of daily living as demonstrated by his need for Mother as a home health aide. Trial Court Opinion, 11/16/22, at 2. The court stated,

> With regard to [Father], he has not demonstrated an ability to independently care for [K.B.]. The testimony was that [Father] needs a home health aide. That at times he's unable to cook for himself, he is also unable to take care of some of his own daily life activities, including getting . . . dressed, that weighs serious concerns with the [c]ourt, that without a home health aide [Father] would not be able to independently care for this child.

N.T., 9/19/22, at 149-50.

Father challenges the termination of his parental rights pursuant to § 2511(a)(2) by baldly asserting that he completed his reunification objectives. Father states:

In the instant matter, evidence demonstrates [F]ather's attempt at establishing a loving relationship with his child because he was compliant with objectives and [F]ather was ready for his son to be returned to his care[.] Father through his efforts to remain close to his child and attempting to complete [FSP ("Family Service Plan")] objectives, exhibited that he was trying to eradicate any neglect or abuse, that caused him to be placed in foster care.

In [*In Interest of C.M.E.*, 448 A.2d. 59, 63 (Pa. 1982)], [this] Court stated that "even if there has been a long separation occasioned by parental neglect or incapacity, termination of parental rights cannot be ordered if there is a reasonable possibility that the causes and conditions which led to the separation can be remedied and the family restored." [*C.M.E.*, 488 A.2d. at 63]. Father has demonstrated his commitment to remain close to his child because he visits and had a good relationship with his child. Furthermore, DHS has not proved that he could not remedy such conditions.

Father's brief, unnumbered at 8 (citations to record omitted).

A review of the record supports the trial court's finding of grounds for termination under § 2511(a)(2). Looking first at Father's physical impairment and its effect on his ability to parent K.B., we reiterate, at the time of the hearing, Mother and Father were residing together, with Mother serving as Father's home health care aide. *Id*. at 9-11. Father testified that, *inter alia*, he has disintegrating disc disease and numerous herniated discs. N.T., 9/19/22, at 101, 107. As a result of such conditions, he requires aid and assistance. *Id*. at 101, 117. Ms. Custus, the CUA case manager, expressed her concerns as to Father's "ability to care" for the child considering his physical condition. *Id*. at 61-62.

Beyond Father's physical limitations, the record reveals that Father also failed to complete some of his reunification objectives. While Father provided

a copy of his residential lease, participated in parenting classes, submitted eight drug screens[8], and eventually completed both of the required behavioral health evaluations, he failed to document his total income or medical records. *Id*. at 28-30, 35-37, 51-54, 61, 63. The most substantial failure related to Father's inconsistent participation in the supervised visitations with K.B. Significantly, there was a ten-month gap in visitation from October 18, 2021, to August 10, 2022. *Id*. at 41, 55, 97. Ms. Custus testified that, although visits were available to Father during this period, Father declined to participate because of his personal conflicts with CUA staff and Maternal Aunt. *Id*. at 39-40, 42, 55, 97-101, 111. As a result, Ms. Custus indicated that reunification was no longer an option, explaining:

> Q. Has reunification with [F]ather been ruled out at this point?
>
> A. Yes.
>
> Q. Why is that?
>
> A. Given the length of time it's taken for the child to be reunified with father, the lack of compliance with documentation, the lack of visits [-] consistent visitation.

*Id*. at 45-46.

Based on the foregoing, we discern no abuse of discretion by the court in concluding that termination pursuant to § 2511(a)(2) is warranted. The record substantiates that Father's incapacity and refusals have caused K.B. to be without essential parental care, control, or subsistence necessary for his

---

[8] Although Father tested positive for opioids, he documented that he was prescribed opioids for pain related to his disc conditions. N.T., 9/19/22, at 107.

physical or mental well-being. Further, the conditions and causes of same cannot or will not be remedied. ***See In re Adoption of M.E.P.***, ***supra*** at 1272. Father suffers from an ongoing physical disability that limits his ability to provide his son parental care without the assistance of a home health aide. More importantly, Father demonstrated his refusal to perform parental duties by electing to forego ten months of supervised visitation with his son simply because he did not get along with some of the providers and his son's kinship foster parent, Maternal Aunt. In essence, Father elevated his disdain for certain individuals over the needs of his child. This palpable evidence of Father's refusal to accept his parental obligation supports the trial court's finding of grounds for termination under § 2511(a)(2), and we reject any eleventh-hour assertions concerning Father's future compliance. ***See In re S.C.***, ***supra*** at 1105.

Next, we review the trial court's needs and welfare analysis pursuant to § 2511(b). Our Supreme Court outlined this inquiry as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa.Super. 2012). ***In In re E.M.***, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

- 12 -

*In re T.S.M.*, *supra* at 267.

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, § 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, *supra* at 1121 (internal citations omitted). Moreover, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *T.S.M.*, *supra* at 267. The Court directed that, in weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

Furthermore,

While a parent's emotional bond with his or her child is a major aspect of the § 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d at 103) (cleaned up).

As to subsection (b), the trial court reasoned, "[T]here was no evidence to support a parent-child bond existed between Father and [K.B.]. Prior to August of 2022, Father had not visited [K.B.] since October of 2021, therefore, [K.B.] would not suffer irreparable harm if freed for adoption." Trial Court Opinion, 11/16/22, at 2 (citations to record omitted).

As best we can discern from his brief, Father contends that the trial court erred in failing to consider his relationship with K.B. and the effect of termination on K.B.'s needs and welfare. Father's brief, unnumbered at 9-14. Father's argument mostly reiterates his attempts to satisfy his reunification objectives, frames his relationship with K.B., and highlights the importance of maintaining the parent-child bond, generally. *Id*. at 12-14.

Again, the certified record supports the trial court's needs and welfare analysis. Contrary to Father's characterization of a beneficial parent-child bond, the record evinces the lack of a bond between K.B. and Father. As noted *supra*, there was a ten-month gap in visitation from October 18, 2021, to August 10, 2022. N.T., 9/19/22, at 41, 55, 97. Further, when Father did participate in visitation, it never progressed beyond supervised visits and the court decreased it from twice weekly to weekly in December 2021. *Id*. at 38. When asked to describe the nature of visitations, Ms. Custus explained, "For the two visits that did happen this year it was reported that [Father] is having trouble engaging with [K.B.], [K.B.] cries during the visits, it's very difficult for him to maintain." *Id*. at 42. Pointing to the current nature of visitation,

Ms. Custus indicated that there was no bond between Father and K.B. She stated:

> Q. In your opinion is there a parent child relationship between [F]ather and [K.B.]?
>
> A. No.
>
> Q. Why do you say that?
>
> A. Due to the inconsistent nature of visits[, Father] has not allowed time for [K.B.] to bond[,] which is why [K.B.] reacts the way that he does now when there are visits.

*Id*. at 46. Ms. Custus further noted that K.B. does not ask to see Father, whom he refers to as "the man." *Id*. As a result, Ms. Custus opined that termination of Father's parental rights would not cause K.B. irreparable harm. *Id*. at 47.

More importantly, K.B. has resided with Maternal Aunt, his pre-adoptive kinship foster parent, for the entire thirty-one-month period since his discharge from the hospital in February 2020. *Id*. at 8. As to the relationship between K.B. and Maternal Aunt, Ms. Custus testified:

> Q. So what is the current relationship like between [K.B.] and the resource parent?
>
> A. [K.B.] is very bonded with the resource parent.
>
> Q. So who does [K.B.] look to then when he's sick, hungry or hurt?
>
> A. The resource parent.
>
> Q. Who takes [K.B.] to medical appointments?
>
> A. The resource parent.
>
> Q. Who provides for [K.B.] and takes care of daily needs?
>
> A. The resource parent.

*Id*. at 47.  As such, noting the length of time K.B. had been placed, Ms. Custus further expressed that K.B. should be freed for adoption.  She stated:

> Q. If child were freed for adoption would the current resource parent be interested in providing permanency?
>
> A. Yes.
>
> Q. Do you think it is in the best interest of [K.B.] to be freed for adoption at this time?
>
> A. Yes.
>
> Q. Why do you think that?
>
> A. Beings as though we are approaching three years with this case, I think it would be in the best interest of [K.B.] for him to seek a goal that much [*sic*] appropriate.
>
> Q. Do you believe at this point that reaching permanency for this child is of utmost importance?
>
> A. Yes.

*Id*. at 47-48.

Similarly, the CASA program director, Patricia Kinkle, confirmed both the bond between K.B. and Maternal Aunt and the lack of bond between K.B. and Father.  She noted,

> [K.B.] is extremely bonded to [Maternal Aunt] because that is who has been caring for him for his entire life.  He does not have much of a relationship with . . . his father, he has not had consistent visits at any point in his life with his father.  At the visits, the few visits that [F]ather has had with [K.B.,] he has struggled to console him when he's upset, he struggled to meet any of the basic needs because he does not have a relationship with [K.B.].

*Id*. at 93-94.

As highlighted *supra*, Father's contact with K.B. was infrequent, Father refused to attend the supervised visitations scheduled at the agency due to

his disagreements with caseworkers and Maternal Aunt, and there is no evidence that a positive parental relationship exists between Father and K.B., who looks to Maternal Aunt for parental care, comfort, and control. Accordingly, the certified record supports the trial court's finding that terminating Father's parental rights serves K.B.'s developmental, physical, and emotional needs and welfare pursuant to § 2511(b).

Father's third issue presents a challenge to the trial court's dependency order changing the permanency goal of K.B. to adoption. We review decisions changing a placement goal for an abuse of discretion. *In re R.J.T.,* 9 A.3d 1179, 1190 (Pa. 2010). When considering a petition for a goal change for a dependent child, the trial court must determine the matters set forth at 42 Pa.C.S. § 6351(f) of the Juvenile Act. *In re S.B.*, 943 A.2d 973, 978 (Pa.Super. 2008). In making these determinations, the best interests of the child, and not the interests of the parent, must guide the trial court. *In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super. 2011). Considering Father's failure to pursue visitation with his son, the sheer amount of time K.B. has spent in pre-adoptive kinship foster care with Maternal Aunt, and the need for K.B. to achieve stability in his own life, the trial court's decision to change the permanency goal to adoption was well within its discretion. Accordingly, we do not disturb it.

Based on the foregoing, we affirm the decree terminating Father's parental rights and affirm the order changing the permanency goal to adoption.

Termination decree and goal change order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/21/2023